2013 UT App 206

**Lou Anne SWEAT, Plaintiff and Appellant,**

v.

**Jess BOEDER and Schafer Boeder, Defendants and Appellees.**

**No. 20120397–CA.**

Court of Appeals of Utah.

Aug. 22, 2013.

---

4. Contrary to Stepsaver's suggestion, an award of costs under rule 34(b) of the Utah Rules of Appellate Procedure does not include attorney fees. *See* Utah R.App. P. 34(b).

Scott T. Poston, Park City, for Appellant.

Albert W. Gray, Sandy, and Trent D. Holgate, for Appellees.

Judge WILLIAM A. THORNE JR. authored this Memorandum Decision, in which Judges CAROLYN B. McHUGH and J. FREDERIC VOROS JR. concurred.

### Memorandum Decision

THORNE, Judge:

¶ 1 Plaintiff Lou Anne Sweat appeals from the district court's decision granting Defen-dants Jess Boeder (Father) and Schafer Boeder's (Son) (collectively, the Boeders) motion to dismiss for failure to state a claim. We affirm.

¶ 2 Sweat filed a complaint against Father on January 10, 2011, alleging that he was the driver who had crashed into the back of Sweat's vehicle when it was stopped at a traffic light on January 12, 2007. On April 14, 2011, Sweat filed an amended complaint adding Son in the case caption as a defendant but again alleging that Father was the driver in the automobile accident. On October 27, 2011, the Boeders filed a motion to dismiss for failure to state a claim stating that Father was not the driver and that the four-year statute of limitations had expired as to Son, who was the actual driver of the vehicle. The district court granted the Boeders' motion to dismiss.

¶ 3 Sweat argues that the district court erred in granting the motion to dismiss against Son based on the running of the statute of limitations. Specifically, Sweat contends that the relation back doctrine under Utah Rule of Civil Procedure 15(c) permits her amended complaint—adding Son as a defendant—to relate back to the timely filed original complaint. Rule 15(c) provides "[w]henever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original proceeding." Utah R. Civ. P. 15(c).

¶ 4 Generally, an amended pleading that adds new parties will not relate back to the original filing. *Penrose v. Ross*, 2003 UT App 157, ¶ 9, 71 P.3d 631. There are, however, two types of cases where relation back under rule 15(c) permits amended complaints with new parties: "misnomer" and "identity of interest" cases. *Id.* ¶ 11 (internal quotation marks omitted). Here, the district court determined that the facts of this case are parallel to those in *Penrose*, wherein the court held that neither the misnomer nor identity of interest exception applied. We review the district court's rule 15(c) analysis under a correctness standard. *Gary Porter*

*Constr. v. Fox Constr., Inc.*, 2004 UT App 354, ¶ 31, 101 P.3d 371.

¶ 5 Sweat argues that her initial naming of Father as the defendant was a misnomer because she reasonably relied upon the Salt Lake City Police Department driver exchange form identifying Father as both the driver and the owner of the automobile involved in the accident with Sweat.[1] Sweat also argues that this is a misnomer case because Son was named in the caption of the amended complaint but inadvertently left out of the body of the amended complaint. However, neither scenario fits under the category of misnomer.

¶ 6 "A misnomer is involved when the correct party was served so that the party before the Court is the one Plaintiff intended to sue, but the name or description of the party in the Complaint is deficient in some respect." *Tan v. Ohio Cas. Ins. Co.*, 2007 UT App 93, ¶ 12, 157 P.3d 367 (citation and internal quotation marks omitted). Additionally, courts will generally allow an amendment under rule 15 to correct technical defects in the naming or identification of a party "[i]f the body of the complaint correctly identifies the party, or if the proper person has actually been served with process." *Id.* (citation and internal quotation marks omitted); *see also Penrose*, 2003 UT App 157, ¶¶ 12, 14, 71 P.3d 631.

¶ 7 This is not the case presented here. Sweat neither identified Son in any capacity in the original complaint nor served Son until after the expiration of the statute of limitations. Father and Son are two distinct defendants, each identified in different documents provided to Sweat prior to the running of the statute of limitations.[2] Because Son's identity as the driver was ascertainable and Son was neither served nor identified in the original complaint, this case does not involve a technical mistake. The addition or substitution of Son as a defendant would amount to a substantial change and not merely a for-

mality or technicality allowed under the relation back doctrine. Thus, this case does not involve a misnomer. Having so determined, we next consider whether Father and Son have an identity of interest permitting the amended complaint to relate back.

¶ 8 "Parties have an identity of interest when the real parties in interest were sufficiently alerted to the proceedings, or were involved in them unofficially, from an early stage." *Sulzen v. Williams*, 1999 UT App 76, ¶ 14, 977 P.2d 497 (citation and internal quotation marks omitted). To qualify as an identity of interest case, Sweat must establish that

(1) the amended pleading alleged only claims that arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading and (2) the added party had received (actual or constructive) notice that it would have been a proper party to the original pleading such that no prejudice would result from preventing the new party from using a statute of limitations defense that otherwise would have been available.

*Ottens v. McNeil*, 2010 UT App 237, ¶ 43, 239 P.3d 308 (citation and internal quotation marks omitted). One of the ways to establish constructive notice is to prove "that the original and new party share 'the same interest' concerning the litigation, including their legal defenses and positions such that 'notice of the action against one serves to provide notice of the action to the other.'" *Id.* ¶ 45 (quoting *Penrose*, 2003 UT App 157, ¶¶ 15–19, 71 P.3d 631). This method of proving constructive notice is known as the "Notice Transfer Test." *Id.* (citation and internal quotation marks omitted).

¶ 9 Here, the district court in applying the Notice Transfer Test noted that the facts of this case are similar to those in *Penrose v. Ross*, 2003 UT App 157, 71 P.3d 631, and determined that the identity of interest analysis in that case is relevant to this

---

1. Son, in his affidavit, averred that he gave the investigating officer his own name and showed the officer his driver license and the vehicle's registration. The citation that the investigating officer issued to Son was in Son's name, not Father's name.

2. In December 2010, the Boeders' insurance company sent a settlement letter to Sweat's attorney identifying Son as the insured, stating, "Our Insured: Schafer C Boeder."

case.  The *Penrose* court determined that the father and son in that case did not have an identity of interest because they did not have the same legal interest in the outcome of the case.  As in *Penrose*, Father's defense is that he was not negligent or liable because he was not the driver and Son's affirmative defense focuses on the running of the statute of limitations.  The legal position and defenses of the two parties are not the same and a disposition of either party does not affect the claims or defenses available to the other. *See id.* ¶ 19.  Because the parties do not have the same legal interest there is no identity of interest.  *See id.*

¶ 10 Since this case does not involve either a misnomer or an identity of interest, we conclude that the district court correctly declined to permit Sweat's amended complaint to relate back to the original complaint and therefore properly dismissed the case against Son based on the running of the statute of limitations.[3]  Affirmed.

2013 UT App 205

**WASHINGTON COUNTY SCHOOL DISTRICT and Utah School Board Risk Management Association, Petitioners,**

v.

**LABOR COMMISSION and Steven H. Brown, Respondents.**

No. 20110228–CA.

Court of Appeals of Utah.

Aug. 22, 2013.

---

**3.**  In her summary of the arguments, Sweat cursorily mentions that Son had actual knowledge—at the same time Father did—of the negligence claim asserted against Father.  This court in *Ottens v. McNeil*, 2010 UT App 237, 239 P.3d 308, considered whether actual knowledge existed in that matter.  *Id.* ¶ 50.  However, in *Ottens* we found that unity of interest existed as to one of the claims.  *Id.* ¶ 48.  We have determined that there is no unity of interest here, and therefore we do not consider Sweat's actual knowledge argument.

Bret A. Gardner and Kristy L. Bertelsen, for Petitioners.

Aaron J. Prisbrey and Elizabeth B. Grimshaw, for Respondent Steven H. Brown.

Alan L. Hennebold, for Respondent Labor Commission.

Judge CAROLYN B. MCHUGH authored this Opinion, in which Judges JAMES Z. DAVIS and STEPHEN L. ROTH concurred.

Opinion

McHUGH, Judge:

¶ 1 The Washington County School District and the Utah School Board Risk Management Association (collectively, the School District) seek judicial review of the final order of the Labor Commission (the Commission) awarding Steven H. Brown additional workers' compensation benefits. We decline to disturb the Commission's decision.

## BACKGROUND

¶ 2 On January 27, 2003, while employed as a bus driver for the School District, Mr. Brown fell off the steps of a school bus. He injured his lower back and was treated by Dr. Dale Stott for left-sided low-back and leg pain. Dr. Stott initially attempted to manage Mr. Brown's pain by administering lumbar epidural steroid injections on May 12, 2003, June 12, 2003, July 22, 2003, May 12, 2004, and August 3, 2004; a nerve block on October 8, 2003; and lumbar paravertebral facet nerve radiofrequency destruction on November 4, 2003, and May 19, 2004.[1] Despite these treatments, Mr. Brown continued to experience back pain. As a result, Dr.

---

1. Radiofrequency destruction or radiofrequency ablation "is a procedure used to reduce pain. An electrical current produced by a radio wave is used to heat up a small area of nerve tissue, thereby decreasing pain signals from that specif- ic area." *See Radiofrequency Ablation for Arthritis Pain,* WebMD, http://www.webmd.com/pain-management/radiofrequency-ablation (last visited Aug. 16, 2013).

Stott referred him to a spine surgeon, Dr. Mark Kabins.

¶ 3 On August 20, 2004, Dr. Kabins concluded that an MRI of Mr. Brown's spine "demonstrates a large extruded disc herniation at the L4–5[2] with sequestration." [3] Dr. Kabins performed surgery to repair the left side of Mr. Brown's lumbar spine at the L4–5 level on August 29, 2004. Dr. Kabins's notes from an October 1, 2004 postoperative examination indicate that Mr. Brown "does have intermittent back discomfort, but is clearly improved and stable." Dr. Kabins prescribed pain medication and scheduled a final follow-up visit to see Mr. Brown a month later. However, Mr. Brown returned to Dr. Kabins on October 16, 2004, and reported that he "was doing well until 4 days ago when he developed onset of back discomfort." Dr. Kabins prescribed Mr. Brown additional pain medication to address his "increased back pain and ... discomfort in his left leg." Three weeks later, Dr. Kabins reported that Mr. Brown was "doing well with minimal discomfort."

¶ 4 Mr. Brown sought workers' compensation benefits for his 2003 workplace injury. The School District accepted liability for the injury and paid him permanent partial disability compensation as well as medical benefits. At that time, the Commission rated him with a 10% whole person impairment and approved his receipt of workers' compensation benefits. In October 2004, Mr. Brown returned to work driving a school bus for the School District.

¶ 5 On March 8, 2007, Mr. Brown again saw Dr. Stott and reported that he was experiencing "low back pain and left leg pain and numbness," which "ha[d] existed for 2 years." Mr. Brown indicated to Dr. Stott that he did well for about one year after the 2004 surgery, but then the pain returned, and he now suffered from it daily. Dr. Stott diagnosed Mr. Brown with "Failed Back Surgery Syndrome" and "Probable recurrent disc herniation." Dr. Stott also ordered an MRI, which was performed on March 22, 2007. The MRI confirmed that Mr. Brown had an L4–5 recurrent disc extrusion [4] slightly indenting the thecal sac [5] and mildly compromising both the lateral recesses [6] and the right neuroforamen.[7] The radiology report from the MRI also indicated some right side involvement, stating, "L4–5 demonstrates right posterolateral[8] prominence of the disc without enhancement compatible with a broad disc extrusion slightly indenting the thecal sac. This mildly compromises both lateral recesses and the right neuroforamen." To treat the pain caused by this condition, Dr. Stott administered another lumbar epidural steroid injection on April 9, 2007. Dr. Stott's procedure report described the preinjection diagnosis as "Failed Back Surgery Syndrome"

2. "The vertebrae ... are organized into segments, starting at the top of the spinal cord, and within each segment they are numbered.... The lumbar area (between the chest area and the pelvis) contains 5 lumbar vertebrae (L1 through L5)...." *See Living with a Spinal Cord Injury—What Happens*, WebMD (Feb. 16, 2011), http://www.webmd.com/brain/tc/living-with-a-spinal-cord-injury-what-happens.

3. "A disc herniation occurs when the soft cushion between the spinal bone ruptures.... A disc sequestration occurs when the center, gelatinous portion of the disc is not only squeezed out, but also separated from the main part of the disc." Jonathan Cluett, *Disc Extrusion, Protrusion, and Sequestration*, About.com (Oct. 10, 2005), http://orthopedics.about.com/od/herniateddisc/g/discs.htm.

4. "A disc extrusion occurs when the outer part of the spinal disc ruptures, allowing the inner, gelatinous part of the disc to squeeze out." *Id.*

5. The thecal sac surrounds the spinal cord and is filled with cerebral spinal fluid. *See Thecal sac*, Wikipedia, http://en.wikipedia.org/wiki/Thecal_sac (last visited Aug. 16, 2013).

6. "The lateral recess is the space within the spinal canal located toward the sides." Anne Asher, *Lateral Recess*, About.com (June 22, 2011), http://backandneck.about.com/od/anatomy explained/g/Lateral-Recess.htm.

7. The neuroforamen is an opening between vertebrae that allows for the passage of the nerves from the spinal cord to other parts of the body. *See Intervertebral foramina*, Wikipedia, http://en.wikipedia.org/wiki/Intervertebral_foramina (last visited Aug. 16, 2013).

8. Posterolateral is defined as "[b]ehind and to one side, specifically to the outer side." *See Posterolateral*, Drugs.com, http://www.drugs.com/dict/posterolateral.html (last visited Aug. 16, 2013).

and "Lumbar radiculopathy," [9] and the postinjection diagnosis as "SAME."

¶ 6 Five months later, on September 1, 2007, Mr. Brown was attending a local festival when a person called out his name and then jumped on his back, forcibly knocking Mr. Brown to the ground. Although Mr. Brown did not see the person, based on his long experience as a bus driver he assumed it was a child he drove on the School District's bus who was excited to see him. Mr. Brown felt immediate back pain, and following the festival incident, he suffered from constant stabbing, burning pain in his lumbar area that radiated from his back all the way down his legs.

¶ 7 Dr. Stott examined Mr. Brown on September 19, 2007, and reported that

Steven Brown is a 38 year-old male receiving treatment at Zion Pain Management for low back pain and right lower extremity pain. Today he presents with the new right sided symptoms. In the past, his symptoms were left sided, but he[ ] reports these have resolved. Steven has received the following interventional pain management procedures since his last office visit: lumbar transforaminal epidural steroid injection × 2. He reports 100 percent improvement from this procedure. In last 3 weeks has started to radiate to right buttock and right lower extremity into right 2, 3, 4 toes of right foot with numbness and tingling. He states this happened after someone jumped on him and he fell. He states the pain is constant.

Dr. Stott again diagnosed Mr. Brown with "Failed Back Surgery Syndrome" and "Lumbar radiculopathy." Dr. Stott also ordered a new MRI.

¶ 8 Dr. Stott's notes of a subsequent visit on October 2, 2007, state that the second MRI showed "[n]ew disc sequestration ex-tending cranially behind the L4 Veterbral body with moderate right lateral recess compromise and indentation of the thecal sack." The radiology report further indicates that "this disc extrusion demonstrates a component which extends left posterolaterally as well at L4–5." Dr. Stott determined that Mr. Brown's injuries had progressed since his previous examination and assessed Mr. Brown with "Failed Back Surgery Syndrome," "Lumbar radiculopathy," and "Lumbar Disc Extrusion L4–5."

¶ 9 On October 6, 2007, Mr. Brown consulted with Dr. Kabins, whose notes reflect that since Mr. Brown was last seen on November 5, 2004, he has "undergone maintenance care by Zion Pain Management" and "has had low back pain, left lower extremity radiculopathy." Dr. Kabins further indicated that Mr. Brown "underwent microdecompressive surgery.[ [10] ] He had an excellent outcome. He has subsequently undergone injection therapy ... on a supportive basis." According to Dr. Kabins, Mr. Brown reported that around September 1, 2007, "he ha[d] developed worsening low back pain and worsening right lower extremity radicular symptoms. He relays an event where he was jumped by a young family boy. He fell to the ground, landed on his buttock and developed ... right lower extremity radiculopathy." Dr. Kabins concluded, "Certainly it appears that the causality for the herniated disc is multi factorial, that being a preexisting process in the industrial injury, as well as an acute process from the recent attack/incident." Based on his examination, Dr. Kabins advised Mr. Brown that surgery was reasonable and appropriate.

¶ 10 On October 25, 2007, Mr. Brown consulted with Dr. Gary Snook, who diagnosed him with "Intervertebral disc disorder with myelopathy, lumbar region." [11] Dr. Snook

9. Lumbar radiculopathy is "one clinical name for pain that radiates from a nerve root in the lumbar spine down into your legs...." *Lumbar Radiculopathy—Symptoms, Causes, and Treatments*, LumbarSpinalStenosis.com, http://www.lumbarspinalstenosis.com/lumbarradiculopathy-symptoms-causes-treatments-low-back-leg-pain.html (last visited Aug. 16, 2013).

10. Microdecompressive surgery "is a minimally invasive surgical procedure in which a portion of a herniated [disc] is removed by way of a surgical instrument or laser." *Spinal decompression*, Wikipedia, http://en.wikipedia.org/wiki/Spinal_decompression (last visited Aug. 16, 2013).

11. Myelopathy is defined as "any functional disturbance and/or pathological change in the spinal cord." *Myelopathy*, TheFreeDictionary.com,

also noted that the MRI of the lumbar spine showed "HNP at L4–5 right sided." [12] At a follow-up visit on October 31, 2007, Dr. Snook reported, "The event which precipitated this [lower back] pain was a young child jumped on his back[ ]. He states that the current episode of pain started Sept. 1, 2007 . . . ." Dr. Snook performed spinal surgery on Mr. Brown on November 1 and 5, 2007. Dr. Snook also completed a Treating Physician Opinion report on November 20, 2007, which answers "yes" to the question, "Is there a medical causal relationship between the industrial exposure and the problems for which you have been treating the employee . . . ?" Dr. Snook continued to treat Mr. Brown through December 2007.

¶ 11 After the 2007 incident, Mr. Brown petitioned the Commission for payment of additional medical expenses, other recommended medical care, and additional temporary total disability compensation. In response, the School District filed an answer denying workers' compensation liability for Mr. Brown's new injuries on the ground that there was no medical causation between the 2003 workplace injuries and the 2007 injuries.

¶ 12 At the request of the School District, Dr. Richard Knoebel examined Mr. Brown on March 18, 2008. Dr. Knoebel prepared a report in which he notes,

> Given the MRI scan findings of right-sided disc extrusion with right neural foraminal narrowing remaining, as well as significant degenerative disc disease and disc desiccation at that level noted in MRI scan prior to 9/1/07, it must be said with a reasonable degree of medical probability that "the initial work-related accident (is merely) a contributing cause of the subsequent injury."

Although Dr. Knoebel concluded that Mr. Brown "had a permanent aggravation of his pre-existing L4–5 industrial condition secondary to the non-industrial incident of [2007]," he explained that his conclusion was based on the assumption that this court's decision in *McKesson Corp. v. Labor Commission*, 2002 UT App 10, 41 P.3d 468, "dictates that the previous work related accident has to be 'merely' some contributing cause of the subsequent injury." Dr. Knoebel further opined that the prior workplace injury "certainly was not the most important or significant cause" of the subsequent injury but was "a very minor contributing cause."

¶ 13 A month after he prepared his initial report, Dr. Knoebel had a conversation with the School District's legal counsel. Shortly thereafter, Dr. Knoebel wrote a supplemental report opining that "the subsequent non-industrial low back aggravation . . . was not the 'natural result' of the prior industrial event." The supplemental report further notes, "Not all people with a prior surgical discectomy at L4–5 go on to have a re-rupture as a natural result of the original injury and surgery. In this case the significant cause for the recurrent disc herniation at L4–5 was the non-industrial permanent aggravation of [2007]."

¶ 14 At a hearing before an Administrative Law Judge (ALJ) on May 6, 2008, Mr. Brown gave sworn testimony that he "never recovered from the January 27, 2003 accident and was always stiff and sore and would have [flare] ups that required pain medication." [13] In addition, he introduced his medical records as evidence. Those records included the opinions of Dr. Snook, Dr. Kabins, and Dr. Knoebel.[14] On August 27, 2008, the ALJ issued her written decision, concluding, "All medical evidence supports a finding that the prior industrial disc injury was a contributing

---

http: //medical-dictionary.thefreedictionary. com/myelopathy (last visited Aug. 16, 2013).